2025 IL App (1st) 231263-U

No. 1-23-1263

Order filed February 7, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 04431 |
| | ) | |
| STANLEY HAMELIN, | ) | Honorable |
| | ) | Tyria Walton, |
| Petitioner-Appellant. | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mitchell and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Petitioner's second-stage postconviction petition made a substantial showing that his natural life sentence was unconstitutional as applied to him. Reversed and remanded.

¶ 2    Petitioner, Stanley Hamelin, appeals from the second-stage dismissal of his postconviction petition, wherein he argued that his natural life sentence for offenses he committed when he was 20 years old was unconstitutional. Hamelin contends that he made a substantial showing that his natural life sentence violates the Illinois proportionate penalties clause, as applied to him,

warranting a third-stage evidentiary hearing. He argues in the alternative that he was denied reasonable assistance of postconviction counsel, warranting remand for further second-stage proceedings. For the following reasons, we reverse and remand for a third-stage evidentiary hearing.

¶ 3                              I. BACKGROUND

¶ 4     On January 13, 1994, Hamelin, along with four other men, was charged with first-degree murder, armed robbery, aggravated vehicular hijacking, aggravated kidnaping, vehicular invasion, and aggravated unlawful restraint in connection with the shooting deaths of Reginald Wilson and Felicia Hudson Lewis. The defendants were also charged with aggravated criminal sexual assault and criminal sexual assault of Lewis, as well as burglary of Wilson's vehicle.

¶ 5     In September 1995, Hamelin's trial counsel requested an Illinois Supreme Court Rule 402 conference. Ill. S. Ct. R. 402 (eff. Feb. 1, 1981). The State indicated that it would not agree to a disposition and intended to seek the death penalty.

¶ 6     On October 19, 1995, Hamelin entered a blind guilty plea to two counts of first-degree murder, two counts of armed robbery, and one count of aggravated criminal sexual assault. Prior to the plea, the court told Hamelin that he could be sentenced to death or that he could be given a sentence of natural life in prison if he pled guilty to the murders. Hamelin indicated that he understood the sentences that could be imposed. The court also informed him that at any time during the guilty plea proceedings, he had the right to change his mind, withdraw his plea, and plead not guilty. Hamelin indicated that he understood that he was entering a "blind plea" which meant that the court had not yet determined his sentence.

¶ 7     The State then provided the factual basis for Hamelin's plea, summarized as follows. In the late evening hours of January 12, 1994, Hamelin, Anthony Brown, Carl Williams, Zarius

Johnson, and Scoot Chambers, were riding around in a Chevy Caprice driven by Brown, looking for a car to hijack.

¶ 8     Shortly after midnight, the defendants pulled into a gas station at 79th Street and the Dan Ryan Expressway in Chicago. The victims in this case, Reginald Wilson and Felicia Lewis, were at that gas station. A friend of theirs, Steven Fitch, was also with them. The defendants liked the wheels on Wilson's Chevy Blazer and decided that this would be the car they would hijack.

¶ 9     Hamelin, Chambers, and Williams got out of the Caprice and walked up to the Blazer. Wilson and Lewis were inside the Blazer, while Fitch was inside the gas station. The defendants ordered Wilson and Lewis to get out of the car and into the backseat of the Blazer. Hamelin, Williams, and Chambers got into the Blazer as well. They followed Brown and Johnson, who were in the Caprice, and drove to 47th Street and Vincennes.

¶ 10     Hamelin took jewelry and money from the victims while Chambers pointed a gun at them. Lewis was then ordered to get out of the Blazer and into the backseat of the Caprice, where she was sexually assaulted by Brown. Hamelin was given a gun by Chambers, who pointed it at Wilson.

¶ 11     Hamelin then drove the Blazer to 48th and Vincennes, where Chambers ordered the victims to get out of the car. Chambers had the gun at this time, and ordered both victims to get into a dumpster, where Chambers shot and killed them. Chambers shot Wilson three times and Lewis four times. After the victims were shot and killed, the defendants left the scene. Hamelin was arrested later that day with the other defendants in Wilson's Blazer. Once Hamelin was arrested, he gave a statement detailing his participation in the crimes against Wilson and Lewis.

¶ 12     The trial court accepted Hamelin's blind guilty plea and found him guilty of first-degree murder, armed robbery, and aggravated criminal sexual assault.

¶ 13    Hamelin's sentencing hearing was held on February 14, 1996. In aggravation, Assistant State's Attorney (ASA) Brian Sexton, testified about his conversations with Hamelin on January 14, 1994, and repeated the facts of this case. The State then rested its death penalty eligibility case. Hamelin called no witnesses.

¶ 14    The trial court deemed Hamelin eligible for the death penalty. In aggravation, the State called a police officer as a witness, who testified that in 1986, a 13-year-old girl accused 14-year-old Hamelin of hitting her with a baseball bat; in 1990, police officers were following a car that hit a guard rail and three occupants fled, one of which was Hamelin, and the car was found to be stolen; also in 1990, Hamelin was found driving a stolen car. Detective Carl Malik testified that on December 25, 1994, Elvis Ray was visiting his fiancé and was on her porch when Hamelin and another individual confronted him. Hamelin pointed a gun at Ray and demanded his keys. Hamelin and the other individual drove Ray around and then released him. Ray identified Hamelin in a lineup. A Cook County Corrections Officer testified that in May 1994, she found a shoebox containing bedding material on fire outside of Hamelin's cell. Another officer testified that he found a homemade knife on Hamelin after a disturbance.

¶ 15    In mitigation, sentencing advocate Linda Sobotka of the Public Defender's Office testified that she spoke with Hamelin's family members. She learned that Hamelin did not have much contact with his father, that he transferred to three different schools because he was intimidated by gangs at school, and once Hamelin was beaten and suffered broken bones. Sobotka stated that his family spoke highly of him, and that Hamelin used to go to the store for his grandma. His sister described him as a "homebody," and reported that he helped her take of her children. He helped his younger stepbrother with homework and played basketball with him. The family knew that he had stolen cars but were shocked that he had been involved in a murder.

¶ 16     A psychologist, Dr. Lawrence Heinrich, testified that he examined Hamelin and conducted various intelligence tests. Hamelin's intelligence was in the low-borderline or borderline range, with a verbal IQ of 71, performance IQ of 67, and full-scale IQ of 75. School records indicated that Hamelin was tested in 1983 and placed in special education programs after he was found to be in the borderline range for verbal and the very low range for nonverbal. Dr. Heinrich found Hamelin to have a passive, dependent personality, which made him likely to follow along with others. His social history showed that he had trouble staying away from gangs. Hamelin had identified as a Gangster Disciple in the past but had a Vice Lords tattoo. Dr. Heinrich thought it was significant that Hamelin only knew the other defendants involved in the crime for a short amount of time, showing his impressionability. Dr. Heinrich agreed with the assessment of an Illinois Department of Corrections psychologist that had examined Hamelin and found him to be "nonaggressive" in a structured setting.

¶ 17     The State argued in closing that there were no mitigating factors against imposing the death penalty. Defense counsel noted that Hamelin took responsibility for the crimes and did not want to put the families through trial. Defense counsel stated that Hamelin's statement showed that he agreed to the hijacking only, and not the sexual assault or the murders. Defense counsel asked for natural life in prison instead of the death penalty.

¶ 18     Hamelin then spoke on his own behalf. He stated:

"I'd just like to apologize to the victims' families, putting them through this much trouble and everything, to have them sit through this pain.

I know they must – these families, I'd like to apologize to my family, tell them I'm sorry for putting them through this much pain too."

¶ 19     The trial court then stated:

"[A]fter reviewing the mitigation and exposing me to the factors in mitigation and aggravation, the presentence investigation, the testimony presented here by both the State and the defense, the good comments that were presented, taking into account the testimony concerning your I.Q., and today from what I believe and perceive to be sincere remorse for the families of Felicia Hudson Lewis and Reginald Wilson, I will not impose the death penalty."

¶ 20    The court sentenced Hamelin to natural life in prison without parole for the two murders, and 25 years in prison for each count of armed robbery and sexual assault, to run concurrently to his life sentence. Hamelin did not appeal.

¶ 21                        Post Conviction Proceedings

¶ 22    On November 27, 2017, Hamelin filed a *pro se* postconviction petition that alleged his life sentence without the possibility of parole violated the Eighth Amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. Hamelin stated in his petition that he was only 20 years old at the time of the offenses, and he was not the shooter. He stated that he was immature, susceptible to peer pressure, and had an underdeveloped brain. He also pointed to his life circumstances like the neighborhood he grew up in, his socio-economic status, his introduction to drugs at a young age, and his fatherless home. Hamelin noted that his IDOC disciplinary record stated that he was not "irredeemable."

¶ 23    Hamelin attached an affidavit to his petition, in which he attested:

"1. I grew up in the Robert Taylor projects 4037 S. Federal in Chicago. [] On the southside. I was raised by a single mother and my father was absent in my life.

2. I grew up surrounded by drugs and violence and was forced to be a certain way in order to survive and not become a victim. I got into a lot of fights when I was younger because that was how you stopped people from messing with you.

3. I started hanging out with the wrong crowd and started getting in trouble smoking marijuana, drinking and being heavily influenced by older people. I was only 13 years old when I first actually seen someone killed but people got shot all around us.

4. I hated school and only made it up to 9th grade. I ended up just selling drugs and fighting to make it out of the projects. However, the harder I fought to get out the deeper I fell into it.

5. I was tricked by older guys as they gave me a false sense of reality, family and security of love. I always felt like no one loved me and I was somehow being punished due to my father being gone, being poor and living where I lived.

6. I was beat up a lot when I was younger and forced to hold drugs and hide guns for older guys back then, because they would go to jail and I wouldn't.

7. Over the years I have learned to better myself and I'm no longer that troubled, ill-responsible, immature kid."

¶ 24    On April 18, 2019, the trial court dismissed the petition as frivolous and patently without merit. The trial court noted that a life sentence was not unconstitutional on its face for a young adult offender. It also stated:

"[Hamelin] does not attempt to mount an as-applied challenge. Rather, he requests relief solely on the basis of his age and the general developments in the scientific understanding of brain development indicating the brain is not fully

formed until a person reaches their mid-20s. He does not offer any supporting evidence about his individual characteristics or 'how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* [567 U.S. 460 (2012)] decision applies to [his] specific facts and circumstances.' So asserted, Hamelin's claim is merely that, categorically, the Eighth Amendment and proportionate penalties clause afford him relief due to his age. That amounts to a facial, not an as-applied challenge to his sentence. Our supreme court has made plain that facial challenges based on *Miller* are not available to offenders over 17.

***

For these reasons, Hamelin has not alleged facts that make out an arguable claim. Therefore, his petition is frivolous and patently without merit." (Citations omitted).

¶ 25 The trial court summarily dismissed Hamelin's postconviction petition. However, on August 20, 2021, this court granted an agreed motion for summary disposition that reversed the summary dismissal of the petition and remanded it for second-stage proceedings and appointment of counsel because the petition was not timely ruled upon. On July 8, 2022, Hamelin's appointed attorney filed his Illinois Supreme Court Rule 651 certification, along with a supplemental petition and exhibits.

¶ 26 Counsel submitted in his supplemental petition that he had located certain documents supporting Hamelin's claim that he was "more like a juvenile than an adult" at the time of the crimes. The first was the Report of Psychological Examination conducted by Dr. Heinrich in 1995, who concluded that Hamelin had "the equivalent mental age of a nine-year-old" and that he had

"significantly below average intellectual and cognitive learning ability and capacity." Specifically, the report stated:

> "Mr. Hamelin consistently functions significantly below the average or normal range of intellectual ability. Mr. Hamelin's general fund of information is very limited and constricted. For example, he could not name four recent presidents or correctly answer basic fact questions. He thinks in a very concrete and situation specific manner with only limited ability to process, remember or abstract data. Both his receptive and expressive vocabulary is constricted. *** Mr. Hamelin appears to lack understanding and awareness for many everyday social activities and norms. His achievement scores indicate he does best in simple math (forth [*sic*] grade level), but his reading and spelling skills are developed at less than the third grade level. His measured slow rate of mental growth as well as his history of special education placement indicates limited potential for academic growth and skill development. An additional indicator of Mr. Hamelin's mental limitations is seen in his narrow vocabulary and simple word understanding which is essential for day to day competent functioning. This is reflected in Mr. Hamelin's very low (mildly defective range) on the Peabody Picture Vocabulary Test (equivalent IQ of 63). This is a simple test of passive word recognition and understanding in which the individual matches a single word to one of four pictures. This test indicates that Mr. Hamelin has the equivalent mental age of a nine year old."

¶ 27    Dr. Heinrich concluded that Hamelin likely had "an emotional/mental condition or deficit which substantially contributed to his choices and behavior at the time of [his] offenses."

¶ 28    The other document was the mitigation report from Sobotka, drafted in 1993, describing how Hamelin was pressured to join a gang and suffered a serious beating that resulted in a concussion and broken bones. Sobotka indicated that Hamelin had several jobs, was on the track team in high school, and played softball and baseball.

¶ 29    Counsel also supplemented Hamelin's petition with a research article that discussed how youth between the ages of 18 and 24 years old are developmentally distinct from older adults, and detailing how they should be treated differently than adults in the justice system.

¶ 30    On March 7, 2023, the State filed a motion to dismiss Hamelin's petition, arguing that the Eighth Amendment challenges did not apply because Hamelin was over 18 years old when he committed the murders, and he failed to show how his life sentence violated the proportionate penalties clause of the Illinois Constitution, as applied to him.

¶ 31    At the hearing, defense counsel responded to these arguments saying, regarding the Eighth Amendment challenge, that he did not have an argument because the "case law is pretty well settled." He noted that the law has developed significantly in this area since Hamelin filed his *pro se* petition back in 2017, and because Hamelin was over the age of 18 when he committed the crimes, there would be "no argument regarding that issue."

¶ 32    In response to the proportionate penalties clause argument, defense counsel noted that there had been significant changes to sentencing laws since Hamelin was sentenced in 1996. He argued that the trial court did not have all the scientific information about emerging adults in 1996. The psychological examination by Dr. Heinrich showed all the various testing that Hamelin underwent at the time of sentencing. It showed that Hamelin had the equivalent mental age of a nine-year-old, and therefore while Hamelin was 20 years old at the time of the crimes, he was more like a juvenile, based on the reports in the record.

¶ 33    Defense counsel highlighted that at the time of sentencing, the trial court was not using the mitigation evidence to decide if Hamelin should be sentenced more like a juvenile than as an adult, but rather whether he should be sentenced to death or to life in prison. Defense counsel also noted that Hamelin was free to make this argument in a postconviction petition because he did not enter a negotiated plea bargain. Rather, Hamelin entered a blind plea, before sentencing, knowing he could get either the death penalty or life in prison. He did not get any promises or benefits in exchange for pleading guilty.

¶ 34    The trial court found that the punishment was not cruel and degrading and unusual compared to the facts and circumstances of this case. It further noted that "all of the juvenile brain issues and IQ issues, they were already argued at the point of sentencing." The court also stated that "this is a voluntary plea of guilty and that puts us at a different state than if this was a trial, a finding and a sentence that had been issued in that order. But this is a voluntary plea of guilty, blind, mind you, but he went in knowing the possible outcome of his plea."

¶ 35    The court went on to state:

> "*People v. Jones* is clear that when there is a voluntary plea of guilty, a lot
> of what is afforded in the appellate rights and the post-trial procedure is waived and
> I think that Mr. Hamelin did waive a lot of what he is raising now when he did the
> voluntary blind plea.
>
> And pursuant to *Jones*, you waived constitutional issues or errors. You
> waived any irregularity, I guess, that could happen post-trial. You waived all that
> when you do the voluntary plea.
>
> So Mr. Hamelin's petition does fail. He has not made a substantial showing
> that his constitutional rights have been violated. The supporting affidavits [and]

other materials that are attached to the pleading do not bring him any closer to substantiating that his constitutional rights were violated.

So the state's motion to dismiss will be granted. The petition is dismissed."

¶ 36    Hamelin now appeals.

¶ 37                            II. ANALYSIS

¶ 38    On appeal, Hamelin contends that he is entitled to a third-stage evidentiary hearing where his second-stage petition made a substantial showing that his natural life sentence violates the Illinois proportionate penalties clause as applied to him. Alternatively, Hamelin contends that postconviction counsel did not provide reasonable assistance of counsel by failing to properly substantiate Hamelin's proportionate penalties challenge to his natural life sentence.

¶ 39    The first question we must answer is whether Hamelin is permitted to challenge his sentence despite the fact that he entered a blind guilty plea. The trial court specifically stated, relying on *People v. Jones*, 2021 IL 126432, that Hamelin waived his right to challenge his sentence because he entered a voluntary guilty plea. Hamelin contends that the trial court misinterpreted *Jones*, and that he is permitted to challenge his plea because it was a blind plea, not a negotiated plea.

¶ 40    In *Jones*, the juvenile defendant pleaded guilty to one count of first-degree murder and was sentenced to 50 years in prison pursuant to a fully negotiated plea agreement. *Id.* ¶ 1. The defendant later filed a *pro se* successive postconviction petition arguing his sentence was unconstitutional. *Id.* ¶ 7. The trial court denied the defendant leave to file his petition, and the appellate court affirmed, reasoning that the defendant's knowing and voluntary fully negotiated plea agreement waived any constitutional eighth amendment sentencing challenge. *Id.* ¶ 26

¶ 41   Our supreme court, in *People v. White*, 2025 IL 129767, recently addressed the different effects of a negotiated plea, like the one in *Jones*, and an open or "blind" guilty plea, like the one here. The court in *White* stated:

> "*Jones* makes clear that a defendant waives any sentencing error by entering into a fully negotiated plea involving an agreement to sentence. The waiver stems from contract principles precluding a defendant from unilaterally altering a fully negotiated plea agreement, in which 'the sentence is *inseparable* from the conviction.' However, 'where the record is clear that *absolutely no agreement existed* between the parties as to defendant's sentence, [a] defendant manifestly cannot be breaching such a nonexistent agreement by arguing that the sentence which the court imposed was excessive.' As a consequence, the contract principles barring later challenges to a sentence's length do not apply. Thus, when a defendant enters an open or 'blind' guilty plea where there is no agreement as to sentence, the defendant is not precluded from challenging his sentence." (Citations omitted). *Id.* ¶ 29.

¶ 42   Here, Hamelin knowingly and voluntarily entered into a blind guilty plea, with no agreement as to the sentence. The trial court admonished Hamelin that, if he pleaded guilty, he could be sentenced to death or he could be given a natural life sentence. Thus, it was up to the court to review the evidence and arguments presented at the sentencing hearing and determine Hamelin's sentence. Because Hamelin's blind plea contained no agreement or concession as to his sentence, we find that Hamelin did not waive any constitutional challenge to his sentence. Finding that Hamelin is not precluded from bringing a constitutional challenge to his sentence, we are left with determining the proper relief.

¶ 43    Hamelin contends that his postconviction petition should advance to the third stage where he made a substantial showing that, as applied to him, a natural life sentence for a crime committed when he was 20 years old violates the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970 art. I, § 11. In support of this argument, Hamelin relies on recent case law governing the sentencing of juveniles and young-adult offenders, case law that has evolved considerably since he was sentenced in 1996.

¶ 44    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a tool for criminal defendants to assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred during the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Act] is not an appeal of a defendant's underlying judgment. Rather it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999). The purpose of a proceeding under the Act "is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001).

¶ 45    There are three stages of proceedings under the Act. During the first stage, the circuit court must independently review the postconviction petition, without input from the State, and determine whether it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016); *People v. Johnson*, 2018 IL 122227, ¶ 14. The circuit court may dismiss the case if it makes such a finding. *Id*. If the postconviction petition is not summarily dismissed at the first stage, or if 90 days or more elapsed without the trial court ruling on it (as was the case here), the proceedings move to the second stage. *Id*.

¶ 46    At the second stage of postconviction proceedings, counsel may be appointed to represent the petitioner, and the State may file responsive pleadings. 725 ILCS 5/122-4, 5 (West 2016). The circuit court determines at this stage whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *Johnson*, 2018 IL 122227, ¶ 15. If no such showing is made, the petition is dismissed. *Id*. If, however, the petition sets forth a substantial showing of a constitutional violation, it is advanced to the third stage, where the circuit court conducts an evidentiary hearing. *Id*.; 725 ILCS 5/122-6 (West 2016).

¶ 47    In determining whether to grant a third-stage evidentiary hearing, the circuit court takes all well-pleaded facts in the petition and in any accompanying affidavits as true, unless they are positively rebutted by the record (*Evans*, 186 Ill. 2d at 89), and does not make findings of fact or credibility determinations (*People v. Childress*, 191 Ill. 2d 168, 174 (2000)). The court's concern at this stage is solely whether the "legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle [the] petitioner to relief." *People v. Domagala*, 2013 IL 113688, ¶ 35. We review the dismissal of a postconviction petition at the second stage *de novo*. *People v. Sanders*, 2016 IL 118123, ¶ 31.

¶ 48    Here, Hamelin alleged in his petition that his natural life sentence was unconstitutional as applied to him pursuant to the Illinois proportionate penalties clause. The proportionate penalties clause states: "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Leon Miller*, 202 Ill. 2d 328, 338 (2002). "The Illinois Supreme Court has twice indicated that young adult offenders may establish an unconstitutional life sentence through

a postconviction petition." *People v. Montanez*, 2022 IL App (1st) 191930, ¶ 53 (citing *People v. Thompson*, 2015 IL 118151, ¶ 44, and *People v. Harris*, 2018 IL 121932, ¶ 45).

¶ 49    In *Miller v. Alabama*, 567 U.S. 460 (2012), the United States Supreme Court established a new substantive right that exempted, in all but the rarest of circumstances, juvenile offenders from sentences of life in prison without the opportunity for parole. A sentencing hearing compliant with the Supreme Court's holding in *Miller* is designed to ensure that the defendant is not one of those "rare juvenile offender[s] who exhibits such irretrievable depravity that rehabilitation is impossible and life without parole is justified." *Montgomery v. Louisiana*, 577 U.S. 190, 208 (2016).

¶ 50    *Miller* defined juvenile offenders narrowly as those under the age of 18 at the time of their crimes. *Miller*, 567 U.S. at 465. The Supreme Court held that unless a juvenile's crimes reflected "irreparable corruption," a life sentence without the opportunity for parole was categorically cruel and unusual under the Eighth Amendment of the United States Constitution. *Montgomery*, 577 U.S. at 194-95. In applying this new substantive rule, the Supreme Court has "clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *Harris*, 2018 IL 121932, ¶ 58.

¶ 51    In recent years, however, in Illinois, "our supreme court has acknowledged that young adults – at least those who were 20 years of age or younger at the time of their crimes – may rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support an as-applied challenge to life sentences brought pursuant to the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11)." *People v. Wilson*, 2022 IL App (1st) 192048, ¶ 8 (citing *Thompson*, 2015 IL 118151, ¶¶ 43-44, and *Harris*, 2018 IL 121932, ¶ 48). "In doing so, the court has accepted the possibility that a young-adult offender may be able to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition

of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *Wilson*, 2022 IL App (1st) 192048, ¶ 87 (quoting *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009)).

¶ 52    Here, Hamelin argues that his postconviction petition presents considerable evidence that, at age 20, his individual characteristics rendered him more like a juvenile than an adult. The evidence presented in his petition and accompanying documentation is summarized below.

¶ 53    Dr. Heinrich, in his 1995 report of Hamelin, noted that Hamelin had "the equivalent mental age of a nine-year-old" and that he had "significantly below average intellectual and cognitive learning ability and capacity." Dr. Heinrich concluded that Hamelin likely had "an emotional/mental condition or deficit which substantially contributed to his choices and behavior at the time of [his] offenses."

¶ 54    Sobotka's report, drafted in 1993, described how Hamelin was pressured to join a gang when he was young and suffered a serious beating that resulted in a concussion and broken bones.

¶ 55    Defense counsel supplemented Hamelin's petition with a research article that discussed how youth between the ages of 18 and 24 years old are developmentally distinct from older adults and detailed how they should be treated differently than adults in the justice system.

¶ 56    Hamelin submitted his own affidavit stating that he was only 13 years old when he first saw someone killed. He stated that he started hanging out with the wrong crowd and was heavily influenced by older people. He stated that he was tricked by "older guys" that gave him a false sense of reality. Hamelin also noted in his petition that decades had passed since the 1994 crime, that he was a "changed person," had learned to better himself, and was "no longer that troubled [ir]responsible, immature kid."

¶ 57     We find that the well-pled facts in Hamelin's petition and accompanying documents, taken as true, present substantial evidence that, at age 20, his individual characteristics rendered him more like a juvenile than an adult. The findings outlined by Dr. Heinrich and Sobotka, as well as Hamelin's petition and affidavit, reflect transient characteristics of youth, much like the defendant in a similar case, *People v. Wilson*, 2022 IL App (1st) 192048.

¶ 58     In *Wilson*, the 19-year-old defendant was convicted of first-degree murder in the shooting death of the victim and sentenced to 65 years in prison. *Id.* ¶ 3. He filed a postconviction petition alleging in part that, as applied to him, his 65-year sentence violated the proportionate penalties clause. *Id.* ¶ 49. He argued that at age 19, he displayed many of the same characteristics of immaturity and impulsivity as younger teenagers, and that in proper cases like his, certain emerging adults should receive additional sentencing protections. *Id.* The defendant's appointed counsel presented evidence as to why the defendant's particular characteristics warranted such additional protections. *Id.* ¶ 50. Counsel noted that the defendant was hyperactive but was not prescribed medication; had improper educational placement and insufficient services; had challenges that were not addressed in school; had impulsivity issues; and that with treatment and time, the defendant had improved in prison. *Id.* The defendant attached to his petition school evaluations from when he was in fourth and fifth grade, indicating that he had anxiety and depression which he dealt with by acting out and using poor judgment. *Id.* The defendant also included testimony from Dr. Laurence Steinberg in a federal district court case stating that individuals 10-21 years of age are more impulsive and tend to engage in risky and reckless behavior compared to adults. *Id.* ¶ 56.

¶ 59     The circuit court dismissed the defendant's second-stage petition, and the defendant appealed. *Id.* ¶ 65. On appeal, this court found that the defendant made a substantial showing that

his 65-year sentence, as applied to him, for a crime he committed when he was 19 years old violated the proportionate penalties clause. *Id*. ¶¶ 101-02. This court found that the defendant's petition and attachments made a connection between the applicable science and his own characteristics as a 19-year-old offender. *Id*. ¶ 89. This court sent the defendant's petition back for a third-stage evidentiary hearing. *Id*. ¶ 102.

¶ 60    Here, Hamelin has certainly made a similar connection where the Dr. Heinrich's report finding Hamelin had the mental capacity of a nine-year-old was created after the offense and before sentencing. Dr. Heinrich also indicated that Hamelin had "significantly below average intellectual and cognitive learning ability and capacity," and likely "an emotional/mental condition or deficit which substantially contributed to his choices and behavior at the time of [his] offenses."

¶ 61    Hamelin, like the defendant in *Wilson*, also included relevant research on emerging adults, and noted that he had changed over time in prison. We find that Hamelin was able to make a substantial showing, through an adequate factual record, that his own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was " 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *Wilson*, 2022 IL App (1st) 192048, ¶ 87 (quoting *Klepper*, 234 Ill. 2d at 348-49).

¶ 62    The State maintains, citing *Thompson*, 2018 IL 118151, that Hamelin cannot rely on "age alone" or "generalities based on articles" to make a substantial showing of a constitutional violation, but rather must prove this "by experts who examined the defendant and were able to ascertain his specific development." In *Thompson*, the 19-year-old defendant raised for the first time on appeal from the dismissal of his section 2-1401 (735 ILCS 5/2-1401 (West 2010)) petition, an as-applied constitutional challenge to his life sentence. 2018 IL 118151, ¶ 1. Our supreme court

noted that because an as-applied challenge is dependent on particular facts and circumstances of the individual, it is paramount that the record be sufficiently developed "for purposes of appellate review." *Id*. ¶ 37. The court then highlighted that the defendant relied "exclusively on the 'evolving science' on juvenile maturity and brain development," and that the record contained "nothing about how that science applies to the circumstances of defendant's case."

¶ 63   *Thompson* is wholly inapposite to the case at bar. Here, as described above, Hamelin specifically included extensive findings from a psychologist that were made in 1995, after performing several tests on Hamelin. Hamelin made connections in his petition between the research articles and his particular circumstances. Most notably, Hamelin's case is procedurally different from that of the defendant in *Thompson*. The court's concern at the second stage of postconviction proceedings is solely with the legal sufficiency of the petition's well-pled allegations, which if proven at an evidentiary hearing, would entitle petitioner to relief. *Domagala*, 2013 IL 113688, ¶ 35. We find that Hamelin's petition was legally sufficient to warrant a third-stage evidentiary hearing.

¶ 64   Finally, we address the State's argument that Hamelin "could not outgrow his intellectual impairment that informed his decisions on the day of the murders," and that the evidence "established that his mental deficiencies were not treatable and would not be cured over time." The State argues, relying on *People v. Clark*, 2023 IL 127273, that the evidence shows "the probability of future dangerousness."

¶ 65   In *Clark*, the defendant, who was 24 years old when he committed first-degree murder and robbery, argued in a third successive petition for postconviction relief that his 105-year sentence was unconstitutional as applied to him. 2023 IL 127273, ¶ 1. At the time of the offenses, he "suffered from mental impairments including antisocial personality disorder, borderline

personality disorder, and fetal alcohol syndrome." *Id*. The court found that there was "ample evidence in the record with respect to defendant's diminished impulse control due to his intellectual disabilities, including intense anger, explosive violence, emotional instability, and other behavior issues stemming from his mental impairments." *Id*. ¶ 78. A doctor who testified at the defendant's trial indicated that the most effective treatment would be where the defendant was "restrained or restricted from harming himself or others." *Id*. The court found that these factors "make defendant in this case a continuing danger to reoffend in the context of prison sentencing." *Id*. ¶ 79. The court also noted that the *Miller* court's primary focus was founded principally on the transient characteristics of youth, "characteristics not shared by adults who are intellectually disabled." *Id*. ¶ 81.

¶ 66   *Clark* is wholly inapposite to the case at bar. First, the defendant in *Clark* was 24 years old, and therefore no longer considered an "emerging adult" under Illinois case law. Second, there was simply no evidence presented back in 1996 indicating that Hamelin was "intellectually disabled," nor was there "ample evidence" of intense anger, explosive violence, or emotional instability stemming from any mental impairments indicating that Hamelin needed to be restrained or restricted from harming himself or others. Rather, the well-pled facts presented by Hamelin in his petition and affidavit, as well as the supporting documentation from Dr. Heinrich and Sobotka, taken as true, make a substantial showing that Hamelin's natural life sentence amounts to a constitutional violation. Accordingly, we find that Hamelin is entitled to a third-stage evidentiary hearing.

¶ 67   Having found that Hamelin is entitled to a third-stage evidentiary hearing, we need not address his alternative argument regarding postconviction counsel's ineffectiveness for failing to present enough evidence to support his sentencing claim.

¶ 68                          III. CONCLUSION

¶ 69    We reverse the judgment of the circuit court of Cook County, and remand for a third-stage evidentiary hearing.

¶ 70    Reversed and remanded.