2025 IL App (1st) 231649-U

FIFTH DIVISION
April 11, 2025

No. 1-23-1649

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 94 CR 17095 |
| | ) | |
| PATRICE DANIELS, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Oden Johnson and Mitchell concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court's dismissal of defendant's successive postconviction petition is affirmed where, since we remanded this case for second-stage proceedings, our supreme court has made clear both that (1) evolving caselaw regarding youth-based sentencing claims is insufficient to establish the "cause" necessary to pursue such claims in successive postconviction petitions and (2) defendant's fully negotiated guilty plea bars him from asserting this and any other non-jurisdictional errors.

¶ 2   In the summer of 1994, 18-year-old Patrice Daniels turned himself in to the police, confessing to the murder, just days prior, of Candida Torres. Following a court-ordered examination and fitness hearing, Mr. Daniels, who had a history of psychiatric treatment, was

found fit to stand trial with medication. He pleaded guilty to a single count of first degree murder and was sentenced to natural life in prison.

¶ 3    Twenty-five years later, Mr. Daniels moved for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), in which he argued that, because he was more like a juvenile than an adult at the time of his offense, his life sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We reversed the circuit court's denial of that motion, reasoning that a young-adult offender like Mr. Daniels could not have been expected to raise an as-applied, youth-based sentencing challenge until our supreme court announced that such a claim was cognizable in *People v. Thompson*, 2015 IL 118151, and *People v. Harris*, 2018 IL 121932. *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 25-27. We noted that Mr. Daniels had endured an "unusually harsh childhood and suffered from a number of psychological conditions that could have inhibited his development and caused him to act impulsively." *Id.* ¶ 33. This, when viewed alongside the above authorities and emerging neuroscience, we believed sufficiently alleged the cause and prejudice required to file a successive petition. *Id.* ¶¶ 33-34.

¶ 4    On remand, Mr. Daniels, now represented by counsel, worked to amend his petition to document his long history of psychiatric problems, the impulsivity and lack of judgment he exhibited as both a juvenile and a young adult, and his demonstrated rehabilitation following the receipt of proper mental health care. During that same time, however, our supreme court issued several key opinions that have changed the legal landscape for youth-based sentencing challenges. The circuit court concluded that Mr. Daniels was barred by these more recent cases from pursuing his claim and, on appeal, we find we must agree. Despite evidence of his mental health transformation, educational achievements, and admirable efforts to advocate for other mentally ill

prisoners, the law is now clear both that Mr. Daniels cannot establish cause for failing to assert an as-applied proportionate penalties claim in his initial postconviction petition and that his fully negotiated guilty plea bars him from asserting this non-jurisdictional challenge to his agreed sentence.

¶ 5                                    I. BACKGROUND

¶ 6      The facts of this case are well-documented in this court's previous opinions and orders. As we recounted the last time this case was before us:

> "On June 5, 1994, Candida Torres was found strangled to death in Grant Park, partially clothed, in the bushes. Four days later, Mr. Daniels turned himself in to Chicago police and confessed to murdering Ms. Torres. Mr. Daniels told the police that he had dragged Ms. Torres into the bushes, beaten her, choked her with his belt, and sexually assaulted her. Evidence recovered from the scene, including the belt and a hat that Mr. Daniels identified as his, cuts and scratches on his hands and face, human blood found on his shoes, and semen found inside the victim's body all corroborated this account." *Daniels*, 2020 IL App (1st) 171738, ¶ 5.

¶ 7      The State charged Mr. Daniels with multiple counts of first degree murder, criminal assault, and aggravated criminal sexual assault. On June 29, 1994, the circuit court ordered Mr. Daniels to undergo a mental health examination. The court noted that Mr. Daniels "[had] been subject to psychiatric treatment since he was 8 years old," that he had been treated "at ISPI [the Illinois State Psychiatric Institute], Madden MHC [Mental Health Center], Chester, ECHO [Extension for Community Healthcare Outcomes] Mental Health Services," and that, until January 1994, he had "been held in the psychiatric unit at [the Juvenile Justice Department's Illinois Youth Center]."

¶ 8      At Mr. Daniels's fitness hearing, held on September 26, 1995, Dr. Kishore Thampy, an

expert in the field of forensic psychiatry, testified that he had examined Mr. Daniels twice, most recently just a month before the hearing, and had reviewed Mr. Daniels's mental health records. It was Dr. Thampy's opinion, within a reasonable degree of medical certainty, that Mr. Daniels was fit to stand trial. When asked if Mr. Daniels was taking any medications that he "might rely on to maintain his fitness," Dr. Thampy said yes. Mr. Daniels was taking a number of psychotropic medications, including the antidepressant Zoloft, the mood-stabilizer Lithium, the anti-psychotic medication Thorazine, the anti-anxiety drug Addavun [*sic*], and, to counteract the side effects of some of the other medications, Cogentin. Dr. Thampy did not believe, however, that any of these drugs would affect Mr. Daniels's ability to converse and maintain a relationship with his attorney during the course of a trial. Based on this testimony, the circuit court found Mr. Daniels fit to stand trial "so long as he [was] taking the psychotropic drugs that the doctor mentioned."

¶ 9 On October 18, 1995, Mr. Daniels pleaded guilty to a single count of first degree murder (720 ILCS 5/9-1(a)(3) (West 1994)) in exchange for a sentence of natural life in prison. As a factual basis for the plea, the State offered the facts regarding the offense detailed above. The circuit court admonished Mr. Daniels regarding the consequences of a guilty plea, questioned him to establish his understanding of those consequences, and concluded that his plea was knowing, understanding, and voluntary. The judge explained to Mr. Daniels the range of sentences he faced: 20 to 60 years for first degree murder, the possibility of an extended term of up to 120 years, and the death penalty, which was not suspended in Illinois until 2000. The court accepted the State's proffer as a sufficient factual basis for the plea, confirmed that Mr. Daniels understood he was waiving his right to have a presentence investigation report considered at sentencing, and found him guilty of first degree murder. The remaining charges against Mr. Daniels were nol-prossed. The court then imposed the agreed sentence of natural life in prison.

¶ 10    In his initial *pro se* postconviction petition, filed on September 4, 1998, Mr. Daniels argued that he was of unsound mind when he entered his plea and had therefore been denied due process. The circuit court had determined that he was fit to stand trial only with medication, Mr. Daniels argued, but he asserted that documentation from Cermak Hospital would show he had not been taking his prescribed medications at the time of his plea hearing. Mr. Daniels alleged that, from August to October 1995, including on the day of his guilty plea, he "was not under the administration of psychotropic medications," was delusional and hearing voices, and "had a 'sacrificial attitude' " toward his fate. He maintained that the psychiatric examinations he underwent to determine his fitness were not thorough because he was only "asked a maximum of (4) questions on each of [those] visits." Mr. Daniels alleged that he went into the plea hearing believing his sentence would be 60 years, that he did not know he had the right to obtain independent psychological testing, and that he was never told that it was possible for a defendant to be found guilty but mentally ill and be committed to a state psychiatric hospital rather than prison. "Imprisonment is not what is needed," Mr. Daniels argued. "I need intensive Mental Health treatment."

¶ 11    The circuit court dismissed the petition as frivolous and patently without merit. The judge reiterated that Mr. Daniels had been found fit to stand trial with medication, listed the drugs that he was being prescribed at the time of his plea, stated that according to expert testimony those drugs should not have interfered with Mr. Daniels's ability to participate in proceedings, and said that his own memory was that Mr. Daniels "was in touch with reality," gave proper answers to the questions that were posed to him, and was fully advised of his rights. Without ever addressing Mr. Daniels's claim that there was documentation showing he had not been receiving his prescribed drugs at the time of his plea, the judge concluded that Mr. Daniels was simply "dissatisf[ied] with

5

his present and permanent lot in life."

¶ 12     This court affirmed. *People v. Daniels*, 323 Ill. App. 3d 1146 (2001) (table) (unpublished order under Illinois Supreme Court Rule 23). Mr. Daniels was allowed to supplement the record on appeal with the documents from Cermak Hospital that he had referenced in his petition. We have ourselves reviewed those documents and note that they contain over two dozen "Refusal to Consent to Treatment" forms indicating that Mr. Daniels was frequently refusing some or all of his prescribed medications in the months leading up to his guilty plea. He clearly refused to take his once-a-day dose of the anti-psychotic drug Thorazine on the evening of October 17, 1995, the day before his plea hearing.

¶ 13     On April 19, 2017, Mr. Daniels moved for leave to file the successive postconviction petition that is at issue here. Citing *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny, Mr. Daniels argued that his life sentence violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The circuit court denied that motion, concluding that the enhanced sentencing protections afforded by *Miller* applied only to juvenile defendants, defined as offenders under 18 years old at the time of the crime, and Mr. Daniels was 18 years old at the time of his offense.

¶ 14     On August 21, 2020, we reversed the court's dismissal order and remanded for second-stage proceedings. *Daniels*, 2020 IL App (1st) 171738, ¶ 2. We concluded that Mr. Daniels had established cause and prejudice for the filing of a successive petition because our supreme court had only recently made clear that young adult offenders, those between 18 and 21, could assert youth-based as-applied constitutional challenges to life sentences in postconviction proceedings. *Id.* ¶¶ 23, 25-28. We believed it was premature, given the lack of further guidance from the court, to conclude at that juncture that Mr. Daniels would be unable to succeed on such a claim.

*Id.* ¶¶ 33-34.

¶ 15    On remand, the public defender was appointed to represent Mr. Daniels and began the process of gathering documentation to support an amended petition. At a status hearing on May 17, 2023, counsel informed the court that two cases had been decided by the Illinois Supreme Court during that time that might foreclose the relief Mr. Daniels sought—*People v. Jones*, 2021 IL 126432, which counsel believed addressed the effect of a guilty plea "in this very context," and *People v. Clark*, 2023 IL 127273, which, counsel informed the court, dealt with "young adult offenders and their mental health issues at the time of the plea or trial."

¶ 16    At the next hearing, on August 17, 2023, the court confirmed that defense counsel had also read our supreme court's decision in *People v. Moore*, 2023 IL 126461, ¶ 38, holding that "*Miller* did not change the law applicable to young adults" and, therefore, it "did not give them cause to raise new challenges to their sentences." "I will be honest with you," the court said. "I'm anxious to resolve these cases that seem to be over in my opinion." When asked if he would to try to distinguish *Moore*, defense counsel said he intended to file an amended petition "to preserve this issue going forward more than anything else at that point."

¶ 17    The court then said:

> " I have to be frank. I don't see the reason to have a state's attorney assigned. I'm planning on dismissing this case. So I'll let you file whatever you want to file.
>
> Come back and have any argument you might have, but it seems to me People versus Moore forecloses any chances now—at least at this particular point in time, Mr. Daniels cannot meet the cause and prejudice test for his as applied challenge. So on the next court date, I do intend to dismiss the case barring anything unforeseen or barring an argument you might have to convince me otherwise."

¶ 18    Mr. Daniels filed his amended petition that same day. Illinois courts had accepted, he argued, "the possibility that a young adult offender may be able to demonstrate, through a factual record, that his own characteristics were so like those of a juvenile that imposition of a life sentence, without the safeguards established in *Miller*, is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." (Internal quotation marks omitted.) Mr. Daniels cited research on brain development concluding that, like adolescents, young adults are more likely to engage in risk-taking behavior and more prone to impulsivity, especially in stressful or exciting circumstances. He also cited numerous Illinois statutes treating individuals under the age of 21 differently from older adults, from sentencing and parole statutes to laws governing the sales of cigarettes, alcohol, and firearms.

¶ 19    Turning to his own circumstances, Mr. Daniels noted that the facts of his offense did not reflect "a sophisticated, disciplined chain of action but rather actions based on impulse." He argued that it "would be difficult to imagine that [his] brain at the age of 18 was fully developed given his traumatic and inconsistent upbringing," including "his lack of a stable home, regular institutionalization as a juvenile, and physical and sexual abuse at the hands of others." In support of these arguments, Mr. Daniels attached nearly 200 pages of supporting documents.

¶ 20    These included clinical and psychological evaluations, conducted when Mr. Daniels was 16 years old in August 1991 and January 1992, at the request of the juvenile court and the juvenile division of the Illinois Department of Corrections (IDOC), respectively. They detailed Mr. Daniels's "long troubled history" of involvement, since the age of 10, with the mental health, child welfare, and juvenile correctional systems. Mr. Daniels was "severely depressed," had thoughts of suicide, and had engaged in "self mutilatory behavior." He experienced "difficulties making decisions," "difficulty with social relationships," and "many strong unpleasant emotions." His I.Q.

was in the low-to-average range, but he scored significantly lower in his knowledge of social norms and conventions, revealing "deficiencies in his command of practical, or 'common sense' knowledge" and "difficulty intellectually evaluating and making use of his past experiences." One evaluator described Mr. Daniels's judgment as "limited" in that "he seem[ed] to lack a capacity to sustain pro-social conduct. He [had] some insight, but the insight [wa]s incompletely integrated and not usefully available for appropriate and consistent internalized control." Mr. Daniels had "a long history of agitated and self destructive impulsive acts" and seemed to crave the security of an institutional setting, leading another evaluator to predict that he would "simply commit a more serious crime upon release to the community, in order to ensure his return to prison for a lengthier period of time."

¶ 21    Regarding his lack of judgment and impulsivity, that same evaluator noted the following:

> "Patrice is afflicted by serious problems with poor judgment. It is difficult for Patrice to use his intelligence to control his urges or impulses. This tendency is worsened by the fact that Patrice has embraced certain antisocial beliefs and attitudes with which he justifies his impulsive, self-serving behaviors.
>
> Patrice tends to indulge in a great deal of fantasy. It is likely that he uses fantasy excessively as he attempts to deal with his real life problems. ***
>
> * * *
>
> Patrice is very much drawn to peers of the opposite sex. Attention from his female peers tends to feed his grandiose fantasies. He would be very vulnerable to rejection by a girl in whom he had become interested. He might react with rage, or with a self destructive gesture."

¶ 22    The PSI report in this case, prepared on December 16, 1994, when Mr. Daniels was 19

years old, detailed his early home life. His father committed murder at the age of 16 and was incarcerated for 12 years for that crime. He died in 1978, from complications resulting from drug and alcohol abuse. Mr. Daniels lived with his mother, making many moves back and forth from Chicago to Milwaukee. He was frequently left alone while his mother was "out 'partying,' " and reported that she physically abused him. His childhood memories included "living in the projects with several families in one small apartment, 'with everyone on welfare, everyone on drugs, and being beaten with an electrical cord for taken [*sic*] food out of the refrigerator.' " When Mr. Daniels was eight years old, he was sexually abused by the brother of his mother's boyfriend, and he tested positive for syphilis in 1987, when he was 12 years old. He exhibited "multiple healed scars on his wrists and forearms from years of self-mutilating behavior." He had a history of behavioral problems, including "disruptive, oppositional behavior, tantrums/aggressiveness, playing with matches, [and] stealing," that all dated to his early childhood.

¶ 23    Mr. Daniels explained in his petition that over the 29 years he had spent incarcerated, he had matured, revealing a strong capacity for rehabilitation. In support of this, he attached transcripts and certificates of completion for college courses taken through Lakeland College and Lewis University, as well as a variety of programs offered by the IDOC and outside organizations, including those focused on substance abuse education; the management of anger, stress, trauma, bipolar disorder, and anxiety; emotional regulation; religious studies; and creative writing. Based on his most recent psychiatric progress notes, Mr. Daniels asserted that since his transfer to the Joliet Treatment Center (JTC), the health issues he had struggled with for much of his life had stabilized.

¶ 24    Finally, Mr. Daniels highlighted the role he had played as a named plaintiff in class action litigation aimed at improving mental health treatment and conditions for IDOC inmates. He

described how his efforts on behalf of the incarcerated mental health population had led to retaliation by IDOC officials and, ultimately, his transfer to JTC, where his mental health had improved significantly and where he continued to advocate for himself and others as a founding member of the JTC Resident Committee. In January 2018, Mr. Daniels was nominated to the "Impact Fund Class Action Hall of Fame," in recognition of the 2016 settlement he helped achieve on behalf of 11,000 other mentally ill prisoners in Illinois, which provided for the opening of four treatment facilities, the hiring of hundreds more trained staff members, and for prisoners to see a mental health professional at least every 90 days and to receive a written treatment plan.

¶ 25    The State moved to dismiss Mr. Daniels's petition on August 31, 2023, arguing that, following recent changes in the law, he could no longer assert a youth-based sentencing claim. The State pointed, specifically, to our supreme court's holdings in *Clark*, 2023 IL 127273, ¶¶ 61-62; *Moore*, 2023 IL 126461, ¶ 38; and *Jones*, 2021 IL 126432, ¶¶ 20-21, all discussed in more detail below.

¶ 26    Defense counsel elected not to respond to the motion but to instead simply "rest on [the] amendment." The circuit court concluded that this court's 2020 opinion holding that Mr. Daniels had established cause and prejudice for the filing of a successive postconviction petition raising a youth-based sentencing claim was effectively overruled by *Moore*, 2023 IL 126461, and dismissed the petition.

¶ 27                                II. JURISDICTION

¶ 28    The circuit court dismissed Mr. Daniels's petition on August 31, 2023, and he filed a timely notice of appeal the following day. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 606 (eff. Apr. 15, 2024) and 651(a) (eff. July 1, 2017), governing appeals from final

judgments in postconviction proceedings.

¶ 29                                    III. ANALYSIS

¶ 30    The Act provides a method for an imprisoned individual to collaterally attack his or her conviction by establishing that "in the proceedings which resulted in [the] conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2016). Postconviction proceedings occur in three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). At the first stage, the circuit court determines, without input from the State, whether a petition is frivolous or patently without merit. *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2016). If the petition is advanced to the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition; at this stage, the State must either move to dismiss or answer the petition. *Gaultney*, 174 Ill. 2d at 418; 725 ILCS 5/122-4, 122-5 (West 2016). If the defendant then makes a substantial showing of a constitutional violation, he proceeds to the third and final stage, an evidentiary hearing on the merits. *People v. Tate*, 2012 IL 112214, ¶ 10; 725 ILCS 5/122-6 (West 2016).

¶ 31    The Act contemplates the filing of just one postconviction petition. *Id.* § 122-1(f); *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Any claims that were decided on direct appeal or in an earlier postconviction proceeding are generally barred by the doctrine of *res judicata*, and any claims that could have been, but were not, raised in such proceedings are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005). To file a successive postconviction petition, one must obtain leave of court by establishing either "cause and prejudice" for failing to raise the claim earlier or "a fundamental miscarriage of justice based on actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 42; 725 ILCS 5/122-1(f) (West 2016). A petitioner shows cause by "identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial

post-conviction proceedings" and prejudice by demonstrating that the claim not raised during those earlier proceedings "so infected the trial that the resulting conviction or sentence violated due process." *Id.* If leave to file is granted, the petition is docketed for second-stage proceedings. *Robinson*, 2020 IL 123849, ¶ 43.

¶ 32   When we reversed the circuit court's denial of Mr. Daniels's motion for leave to file a successive postconviction petition and remanded this case for second-stage proceedings, we noted that the caselaw concerning youth-based sentencing challenges had changed significantly since Mr. Daniels was sentenced in 1995. In a series of cases tracking our society's evolving understanding that juvenile and adult offenders are different and should be treated differently when it came to sentencing, the United States Supreme Court announced in *Miller*, 567 U.S. at 465, that it was a violation of the eighth amendment's prohibition on cruel and unusual punishment for states to mandate a sentence of life in prison without the opportunity for parole for juvenile offenders. A court may impose such a sentence, but it must do so as an exercise of discretion, after considering factors relevant to the "immaturity, impetuosity, and failure to appreciate risks and consequences" that are the hallmarks of youth. *Id.* at 477-79.

¶ 33   We noted in our 2020 opinion that, although the United States Supreme Court had "clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18" (see *Harris*, 2018 IL 121932, ¶ 58 (discussing cases)), our own supreme court had twice recognized that emerging adults who were between the ages of 18 and 21 at the time of their crimes could also rely on the evolving neuroscience and societal standards underlying the rule in *Miller* to support as-applied challenges to their life sentences under the Illinois proportionate penalties clause. *Daniels*, 2020 IL App (1st) 171738, ¶¶ 24-25. That clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of

restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11.

¶ 34    In *Thompson*, 2015 IL 118151, ¶¶ 43-44, for example, the court held that although the lack of a supporting record prevented a defendant who was 19 years old at the time of his crime from raising such a claim on direct appeal, he was "not necessarily foreclosed" from asserting that claim in postconviction proceedings. And in *Harris*, 2018 IL 121932, ¶ 48, the court concluded that the as-applied, youth-based sentencing challenge of a defendant who, like Mr. Daniels, was 18 years old at the time of his crime, was "more appropriately raised" in a postconviction petition. We stated that, through these cases, the court had "opened the door for a young-adult offender to demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was cruel, degrading, or so wholly disproportionate to the offense that it shock[ed] the moral sense of the community." (Internal quotation marks omitted.) *Daniels*, 2020 IL App (1st) 171738, ¶ 25.

¶ 35    Although it was unclear whether Mr. Daniels would be able to make a substantial showing to support such a claim, it was error, in our view, for the circuit court to deny him the chance to do so, where the record indicated that he "had an unusually harsh childhood and suffered from a number of psychological conditions that could have inhibited his development and caused him to act impulsively." *Id.* ¶ 33. Our supreme court had not yet "outlined the parameters of such a claim," and we therefore felt it was premature to summarily conclude that Mr. Daniels's petition and supporting documents were insufficient to justify further proceedings. *Id.* ¶ 34.

¶ 36    Following our decision, the relevant case law has continued to evolve in a manner that, as the circuit court recognized, has significantly limited the ability to bring such claims in postconviction petitions. In *People v. Dorsey*, 2021 IL 123010, ¶ 74, our supreme court held that, though the holding in *Miller* was announced as a new substantive rule, it did not provide cause for

making an alternative claim in a successive petition under the proportionate penalties clause by an offender who was under 18 because the proportionate penalties clause, which long predated *Miller*, had always been a basis on which a sentence could be challenged. The court relied on *Dorsey* a year-and-a-half later, in *Clark*, 2023 IL 127273, ¶¶ 61-62, extending its holding to successive postconviction claims based on a defendant's intellectual disabilities. And just months later, in *Moore*, 2023 IL 126461, ¶ 40, the case relied on by the circuit court here to dismiss Mr. Daniels's petition on remand, the court made clear that the holdings in those cases applied with equal force to emerging adult offenders—those between 18 and 21 years of age.

¶ 37    Mr. Daniels argues that the State and the circuit court have read *Moore* too broadly. According to him, the *Moore* court merely concluded that *Miller* did not establish cause and prejudice for the filing of a successive petition. Mr. Daniels argues that *his* claim is not based on *Miller* and its progeny—at least not entirely—but rather on his own individual circumstances. What this ignores is that the announcement of the new rule in Miller—and the cases that clarified, and in some cases expanded, that rule—is what gave successive petitioners the basis for claiming that they had "cause" for not having brought their claims at trial or in their initial postconviction petitions. *Dorsey*, *Clark*, and *Moore* squashed that rationale for "cause" for juveniles and young adults alike, and Mr. Daniels has offered no alternative argument for why cause could be satisfied in his case.

¶ 38    Even if *Moore* and the cases that foreshadowed it were not determinative, Mr. Daniels's petition faces another insurmountable obstacle. While this case was on remand, our supreme court also decided *Jones*, 2021 IL 126432. The defendant in that case, who was under the age of 18, had pleaded guilty to one count of first degree murder in exchange for a sentence of 50 years in prison and later sought leave to file a successive postconviction petition asserting a *Miller*-based

15

sentencing challenge. *Id.* ¶ 1. The circuit court denied the motion, and this court agreed, concluding that the fully negotiated guilty plea effectively waived all sentencing challenges. *Id.* ¶¶ 7, 10. So, ultimately, did our supreme court. *Id.* ¶ 26. It explained that plea agreements are fundamentally contracts, and "[e]ntering into a contract is generally a bet on the future." (Internal quotation marks omitted.) *Id.* ¶ 21. "[A] classic guilty plea permits a defendant to gain a present benefit in return for the risk that he may have to [forgo] future favorable legal developments." (Internal quotation marks omitted.) *Id.* "By entering a plea agreement," therefore, "a defendant forecloses any claim of error" and "waives all non-jurisdictional errors or irregularities, *including constitutional ones*." (Internal quotation marks omitted.) *Id.* ¶ 20.

¶ 39    In *People v. White*, 2025 IL 129767, ¶ 29, decided after briefing was complete in this appeal, our supreme court clarified that this rule only applies to fully negotiated plea agreements. Open or "blind" guilty pleas like the one entered into in that case do not carry the same preclusive effect because a blind plea "contain[s] no agreement or concession as to [the defendant's] sentence," and therefore cannot be viewed as waiving future challenges to whatever sentence the court ultimately imposes. *Id.* ¶ 32. Following *Jones* and *White*, it is now clear that by voluntarily entering into a fully negotiated plea agreement with a specific, agreed-upon sentence, Mr. Daniels waived all sentencing errors, even constitutional violations, and even those based on legal support that was not yet available to him at the time of his plea. This is particularly troubling given Mr. Daniels's mental health issues and the questions that still surround his compliance with medication at the time he entered his plea.

¶ 40    However, Mr. Daniels has not convinced us that *Jones* can be distinguished here. He directs our attention to the unpublished order entered in *People v. Schultz*, 2022 IL App (1st) 200919-U, ¶¶ 28-30, where another panel of this court attempted to distinguish *Jones* based on the

fact that the defendant in that case argued that it was the sentence he *could have* received—the threat of which caused him to plead guilty—and not the sentence he *actually did* receive, that was unconstitutional under *Miller*. This distinction does not appear to be relevant. The court could not have been clearer, in both *Jones* and *White*, that *all* claims of error other than those based on a lack of jurisdiction are waived by a fully negotiated guilty plea.

¶ 41    Nor are we persuaded that, as in this court's unpublished decision in *People v. Hamelin*, 2025 IL App (1st) 231263-U, which we permitted Mr. Daniels to cite as supplemental authority in this appeal, his plea was "only partially negotiated." We have reviewed the transcript of the plea hearing, and Mr. Daniels did not plead guilty in exchange for a promise that the State would not seek the death penalty, as he now claims, but in exchange for the specific sentence of natural life in prison. That hearing began with the following exchange:

> "[THE COURT:] And it's been brought to my attention here this morning that both sides are agreeing to a sentence in this case, that being natural life imprisonment without the possibility of parole. Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Do you wish to plead guilty to the charge?
>
> THE DEFENDANT: Yes."

¶ 42    Mr. Daniels was admonished regarding the full range of sentences he could face absent an agreement—20-60 years for first degree murder, which could be enhanced to an extended double term of 120 years if certain aggravating factors were found to be present, life in prison without the possibility of parole, and, because it was alleged that he killed the victim while committing another forcible felony (aggravated criminal sexual assault), the death penalty. He said that he understood this, and the court again confirmed that Mr. Daniels understood the *specific sentence* he was

agreeing to as part of the plea:

> "THE COURT: Do you understand the sentence you will receive if you plead guilty?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Natural life imprisonment without the possibility of parole?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Understanding all this, how do you plead to this charge of first degree murder, guilty or not guilty?
>
> THE DEFENDANT: I plead guilty."

¶ 43    Finally, we are unpersuaded that any comments made by the circuit court in the hearings leading up to its ruling on the State's motion to dismiss warrant reversal. Mr. Daniels argues that the judge's comments showed he was improperly biased and had already made up his mind regarding the merits of Mr. Daniels's petition, even before the State filed its motion to dismiss. As an initial matter, whether bias entered into the court's decision-making is of little relevance where our review of the dismissal of a postconviction petition at the second stage is *de novo* (*People v. Whitfield*, 217 Ill. 2d 177, 182 (2005)). But even so, the judge's comments here reflect nothing more than what defense counsel had by then also noted on the record—it appeared as if the recent opinions of our supreme court detailed above would foreclose the relief Mr. Daniels sought. The circuit court judge gave defense counsel several opportunities to argue why those authorities did not compel dismissal, and counsel declined to do so, electing simply to stand on the contents of the amended petition.

¶ 44    Mr. Daniels's counsel insists in his reply brief that this court "has the authority to help to remedy the injustice of Patrice Daniels serving a life without even the opportunity for release."

We are persuaded, given the two lines of supreme court precedent discussed above, that we do not in fact have any such authority. This is a difficult realization to arrive at, given the facts of this case, ranging from Mr. Daniels's troubled childhood, to his guilty plea made at a time when he was not medication-compliant, to his impressive achievements in prison. Even the State acknowledges, at the conclusion of its brief, that Mr. Daniels is "in a challenging situation," that his "circumstances are noteworthy," and that "[t]here is no doubt that [he] had a troubled past." The State goes on to observe that Mr. Daniels "has dedicated his future to helping others," has achieved "a substantial body of accomplishments over the past 25 years," that "his actions over the course of his incarceration [are] commendable."

¶ 45    The State suggests that Mr. Daniels "might properly" petition the governor's office for executive clemency. The Illinois Constitution gives the governor the authority to "grant reprieves, commutations and pardons, after conviction, for all offenses on such terms as he thinks proper." Ill. Const. 1970, art. 5, §12. That power, though rarely exercised, "is not subject to control by the courts or the legislature," but only "by the Governor's conscience and sense of public duty." *People v. Mata*, 217 Ill. 2d 535, 541 (2005). "[C]lemency is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted." *People ex rel. Madigan v. Snyder*, 208 Ill. 2d 457, 480 (2004).

¶ 46                                    IV. CONCLUSION

¶ 47    For the above reasons, we affirm the circuit court's dismissal of Mr. Daniels's successive postconviction petition.

¶ 48    Affirmed.